IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| TAYBRONNE A. WHITE, | ) | |
|     Plaintiff, | ) | Civil Action No. 7:22-cv-00082 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| HAROLD CLARKE, *et al.*, | ) |     United States District Judge |
|     Defendants. | ) | |

**MEMORANDUM OPINION**

*Pro se* plaintiff Taybronne A. White, an inmate in the custody of the Virginia Department of Corrections (VDOC), brought this civil rights action asserting claims pursuant to 42 U.S.C. § 1983. His claims stem from an incident in which he was bitten by a K-9 dog during the course of a fight with other inmates. His complaint names three defendants: (1) Stephen McReynolds (originally identified only as John Doe), the K-9 Officer who engaged his dog on White; (2) Warden Kiser, who is the warden at Red Onion State Prison (ROSP); and (3) Harold Clarke, the Director of VDOC. White asserts an Eighth Amendment excessive force claim against McReynolds, and he asserts an Eighth Amendment claim against Kiser and Clarke based on a theory of supervisory liability. In particular, he alleges that they condoned a previous pattern of improper canine bites by their subordinates, which led to the violation of his constitutional rights by McReynolds.

Pending before the court are a motion to dismiss by defendants Clarke and Kiser (Dkt. No. 13) and a motion for summary judgment filed by McReynolds (Dkt. No. 22). Also pending before the court are several more recent motions filed by White—two motions for leave to proceed *in forma pauperis* (Dkt. Nos. 34, 36)[1] and a motion for a temporary restraining order

---

[1] White already was granted leave to proceed *in forma pauperis*, allowing him to pay the filing fee in installments under 28 U.S.C. § 1915(b). (Dkt. No. 6.)

(Dkt. No. 32) to which defendants have responded (Dkt. No. 37). For the reasons set forth herein, the court will grant the motion to dismiss, grant the motion for summary judgment, and deny White's motions as moot.

I. FACTUAL BACKGROUND

**A. Allegations in Verified Complaint**

The incident itself is discussed in more detail below, in setting forth the summary judgment evidence. For purposes of the motion to dismiss (brought by Kiser and Clarke), however, the court looks solely to the allegations in the verified complaint and any attached documents. As to these two defendants, White describes his claims against each only in very general terms. White states that Kiser "allow[ed]" McReynolds to use excessive force" and failed to "prevent[] this kind of unconstitutional behavior beforehand and by allowing this pattern of behavior to continue without any kind of intervention." (Compl. ¶ 36, Dkt. No. 1.) Likewise, he accuses Clarke of "allowing a pattern of unconstitutional behavior of his officers to go unchecked and [of] creating written or unwritten policies that allowed this unconstitutional behavior of his officers to continuously occur." (*Id.* ¶ 37.)

The following allegations from the complaint are the only ones that relate to Clarke or Kiser:

> 23. The defendant[s'] propensity to allow the use of K-9 dogs to unconstitutionally maul inmates has been a [recurring] pattern of unconstitutional behavior on the part of [VDOC] officers [at] level 4 and level 5 prisons.
>
> 24. Based upon information and belief, not only are there lawsuits against [VDOC] for the excessive force in use of K-9 dog bites but at least 10 or more inmates are being bit by K-9 dogs every year within [ROSP] alone for petty fights between inmates causing irreparable damages.
> . . .

> 28. [This] . . . pattern of using the constitutional means of deadly K-9 dogs to maul inmates were instances that took place at [ROSP] and [have] been going on for years since the facilities first opened . . . .
>
> 29. All defendants . . . have been made aware of such unconstitutional behavior on the part of its officers and refused to do anything to prevent such brutalities . . . .

(Compl. ¶¶ 23–24, 28–29.)

Also, Paragraphs 25 through 27 refer to three specific incidents of K-9 dogs biting other inmates, and the complaint also includes sworn statements from those three inmates describing their respective incidents. (Compl. Exs. K–M.) Two of these incidents—in which inmates Watson and Guy were involved—occurred *after* White was bitten, so they cannot support a claim that Kiser or Clarke had knowledge prior to the incident involving White. The third—involving inmate Dunmore—occurred in December 2017—prior to White's—but that incident was the subject of a lawsuit that resulted in a defense verdict after a jury trial. *See Dunmore v. Roop*, Case No. 7:18cv00251, ECF No. 104 (W.D. Va. Mar. 29, 2022) (verdict form with finding that officer did not use excessive force in the incident).[2] Thus, even if Kiser and Clarke knew about that lawsuit, it would not have put them on notice of a prior constitutional *violation*, as none was found.

For relief against all defendants, White seeks declaratory and injunctive relief, as well as compensatory and punitive damages and costs. (Compl. ¶¶ 39–42, 44.)

**B. Summary Judgment Record**

    **1. Documents Considered**

In ruling on the summary judgment motion, the court has considered all of the affidavits

---

[2] When ruling on a 12(b)(6) motion, a court may consider facts that are subject to judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A court may take judicial notice of proceedings in federal or state courts of record. *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989).

and attachments submitted by McReynolds, which includes affidavits from McReynolds, Adams (the control booth officer during the incident), and James Bentley (who investigated the incident), and two videos of the incident, from different angles. In support of White, the court treats the factual averments in White's verified complaint, if based on personal knowledge, as facts in opposition to summary judgment. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (explaining that verified complaints by *pro se* prisoners can be considered as affidavits in opposition to summary judgment when the allegations contained therein are based on personal knowledge).[3] Additionally, the court has considered the three sworn declarations attached to the complaint, White's sworn opposition to the motion, and two additional, sworn inmate declarations attached to the opposition.

## 2. Facts Concerning the Incident[4]

As noted, K-9 Officer McReynolds has filed a motion for summary judgment, in which he argues that the undisputed facts show that he did not use excessive force. The focus of his motion is on the incident itself. As White explains it, on the morning of March 2, 2020, White and the remainder of his pod were allowed out of their cells for pod recreation. According to White, he began to use one of the phones that was not being used, and another inmate, apparently M. Johnson,[5] started walking toward him, yelling, "No, no, no, you can't use that phone." When Johnson arrived and White realized he was being "confrontational," White began to hand the phone to him, but Johnson "disrespectfully snatched" the phone from White, leading to a verbal

---

[3] The court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted.

[4] Unless otherwise noted, the facts set forth are undisputed.

[5] The complaint refers to the various inmates as John Does 1 through 4, but the other inmates were identified during the course of the investigation and are identified in the report about the incident, which is part of the public record in this case. Thus, the court uses their names.

argument between White and Johnson. (Compl. ¶¶ 9–11.)

When Johnson approached White in an aggressive manner and got into his "personal space," White "felt threatened and punched a light left jab that knocked [Johnson] back a foot or so." (*Id.* ¶ 12.) Thereafter, White was attacked from behind by inmate J. Wright, and a physical altercation resulted, which involved Johnson, Wright and—at times—two other inmates (E. Hernandez and A. Robinson), all attacking White. White claims that he was brought to the ground by Wright, where he was pinned down by Wright's wrapping his own legs around White's torso while the other inmates beat him. He states that he was unable to move or break away and eventually lost consciousness. (*Id.* ¶¶ 13–15.)

"Shortly after" White "regained consciousness," McReynolds ran in with his K-9 and without any verbal warning, "threw" the dog onto White. (*Id.* ¶ 16.) The dog bit him several times. He was bitten in the left buttocks, the left side of his back, and on his left bicep and tricep. According to White, he has ten permanent bite mark scars, but the marks on his left arm are the most severe. (*Id.*)

White's description of his injuries being extensive is contradicted by the medical records. White was taken to medical where his injuries were documented, including by photographs. Those photos and records show that there were two small areas where the skin had broken, one on his upper left side—described by the nurse as a "skin tear"—and one at the bend of his left arm. (Bledsoe Aff. ¶ 5 & Encls. A–C.) White's wounds were treated with disinfectant, bandaging, and the one at the bend of his left arm with Dermabond, and he was released from the medical unit without further treatment. (*Id.*)

White was seen twice by medical staff approximately two weeks later. Once was after he had requested medical attention, complaining of "nerve damage" and a "loss of feeling" in his

left arm, which he attributed to the dog biting him. (*Id.* ¶ 18; *see also* Ex. E to Compl. (medical request form from White dated March 12, 2020, and stating he needs "to be seen because of steady loss of feeling in arm that was dog bit on 3-2-2020.").) During those appointments, his treatment notes reflect that his wounds had closed, there was no swelling, and he had a full range of motion in his arm. (Bledsoe Aff. ¶¶ 6–7 & Encl. A.) White states that he also was given medication for pain at these appointments, although it did not help. He did not seek further treatment, and there are no records of further physical treatment after these visits for any injuries related to the incident.

White claims in his complaint that he was not "offered therapy to help retrieve the feeling in the left am [lost] because of nerve damage," (Compl. 8), but he points to nothing in his record to show that any medical provider ever recommended therapy. It also is unclear whether he is claiming that he still has numbness or just that he did when he thought he should have received therapy. Any claim that he is still suffering from numbness, though, is significantly undercut by his failure to seek further medical treatment in the more than two years since the incident and before Bledsoe provided her affidavit. White also claims that, as a result of the incident, he has significant trauma that causes him panic and flashbacks every time he sees or encounters a dog, and he has had to be prescribed mental health medication ever since.

White attached to his complaint statements made under penalty of perjury from two inmates who both state that McReynolds directed the dog to bite White without giving a verbal warning to stop fighting. (Decls. of Jonathan Robinson & Anthony Braxton, Compl. Exs. I & J, Dkt. No. 1-1, at 12–13.) One of them also affirms White's statement that White was "knocked out defenseless" when the dog was instructed to bite him. (Braxton Decl., Compl. Ex. J.) And, White's opposition to the summary judgment motion includes sworn statements from Braxton

6

and another inmate, Biddle, which are identical in their wording. Both aver that McReynolds ran as fast as he could to where White was and "threw the dog" on White "without first giving a verbal warning." (Braxton Decl. #2, Dkt. No. 29-1; Biddle Decl., Dkt. No. 29-2.)

The inmates' accounts are contradicted by affidavits from McReynolds and Adams, who was serving as the B-1 gunman from the control room at the time. Adams has provided undisputed testimony that, after the fight began, he gave the inmates an audible warning to stop fighting and to lay on the pod floor, but they continued to fight. (Adams Aff. ¶¶ 5–7, Encl. A to Mot. Summ. J., Dkt. No. 23-1.) Adams then gave a second warning by activating the in-pod buzzer, but this also failed to stop the altercation. Adams then fired one round from the 40mm single launcher, gave another warning, and then fired six direct impact rounds towards the lower extremities of the inmates who were fighting, pausing between each round. Despite these actions, the inmates continued to fight. (*Id.*)

Defendant McReynolds received the call that inmates were fighting (10-18 call) and responded to the altercation with Boris, his assigned canine. When he arrived in the pod, he observed White and Wright fighting in front of the cell doors. According to McReynolds and Adams, McReynolds immediately gave "several warnings" for the inmates to stop fighting or he would engage the dog. Several of the other inmates who had been fighting with White stopped fighting and laid down on the ground after McReynolds and Boris entered the pod.

Because White and Wright continued to fight, McReynolds engaged Boris on White's upper left armpit and upper arm. McReynolds gave additional orders to stop fighting, and White complied. Wright continued to attack White after White had complied, and Boris adjusted to engage Wright on the lower back. After the dog had engaged him, Wright stopped fighting, and McReynolds gave Boris orders to disengage, which it did. White and Wright were both

7

restrained and taken to medical for assessment and treatment.

Defendants also have provided the surveillance video (without audio) of the incident, which the court has reviewed multiple times, and an affidavit from James Bentley, who investigated the incident and provides additional context to the incidents on the video, referring to various portions of the incident by time-stamp.

The video confirms certain portions of McReynolds' testimony, and flatly contradicts some of White's. The video neither confirms nor contradicts other aspects of the incident, which remain unclear even with the video evidence. In some cases, the available video evidence might so completely contradict the plaintiff's version that it could overcome his sworn assertions. *Scott v. Harris*, 550 U.S. 372, 380 (2007). That is, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. Applying that principle, the Fourth Circuit noted in *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), that where "the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape."

In terms of how long the events lasted, the video shows that White threw the first punch at timestamp 8:29:10. At about 8:29:20, other inmates in the pod are starting to move toward the floor, so they had obviously received an order to do so. Moreover, no one disputes Adams's testimony that he gave repeated orders to stop fighting and repeated warnings, both before and in between using impact rounds, in an attempt to stop the fighting. By 8:29:31, eleven seconds later, all inmates are lying prone on the floor, except those still fighting and one other inmate who is standing close by.

At 8:29:33, the door to the pod opens and McReynolds and Boris enter. As soon as they are inside the pod, the additional remaining inmates, with the exception of White and Wright, back away from the area of the fight and go to lie face-down on the floor. McReynolds contends that this is proof that he did give a verbal warning upon his arrival to the pod. As White points out in his response, however, it is also possible that those inmates (who were not fighting on the ground, but standing over White and Wright) saw Boris arrive and moved away on their own, without a verbal warning. (*See* Pl.'s Opp'n to Mot. Summ. J. 2, Dkt. No. 29.) Seven seconds elapse from the time Boris and McReynolds enter the pod until the dog first engaged on White, which occurred at 8:29:40. That timing could have allowed sufficient time to give a warning, despite the fact that McReynolds does not pause while walking to the fighting inmates, but it does not mean that one was given. In short, the video does not confirm or blatantly contradict that an order was given. As such, the court must credit the testimony of White and his witnesses on this point, and conclude—for purposes of considering the facts at summary judgment—that no verbal warning was given by McReynolds before engaging Boris.

As White stated in his complaint, the video reflects that—for at least the early portion of the fight—Wright had his legs locked around White's torso, and could have been holding White down on top of him, *i.e.*, with White on top of Wright. But when Boris first enters the field of view in Video B, at 8:29:40, Wright's legs are no longer locked around White, White is not pinned down, and White is not unconscious, contrary to his assertions. Instead, White is on top of Wright and visibly moving. His movement continues up until the time that Boris first engages. Because the video "blatantly contradicts" White's assertion that he was unconscious, pinned down, or otherwise unable to stop fighting at the time, the court does not credit that testimony from him or his witnesses. The video also blatantly contradicts the testimony of

9

White's witnesses that McReynolds "threw" the dog at White.

Because of the position of the camera relative to the area where the fight was happening (which was behind the stairs), it is difficult to see exactly when Boris disengages from White and engages on Wright. But by 8:30:02, approximately twenty-two seconds from the time Boris first engaged on White, he has disengaged from Wright and McReynolds begins to bend down to pick Boris up. Bentley, consistent with McReynolds's testimony, states that Boris disengaged immediately once each inmate became compliant. Critically, White does not dispute that fact. He simply asserts that he was either prevented from complying by Wright's pinning of him or was unconscious before the dog engaged on him, which—as noted—is contradicted by the video.

In considering the entire record, including the video, and in construing any disputed evidence in the light most favorable to White, the court concludes that the following accurately summarizes the salient facts: White initiated the fight and had been fighting for thirty seconds before the dog engaged on him. During that time, Adams had given repeated orders to stop fighting and lie down on the ground and had fired multiple impact rounds at the fighting inmates. None of these attempts were successful in getting the inmates to stop fighting.

McReynolds and Boris entered the pod. Without giving a verbal warning, McReynolds engaged the dog. At the time, the video conclusively shows that White was *not* unconscious or unable to move at the time the dog engaged. Instead, the video shows White on top of Wright, continuing to fight, before Boris engaged on him. The dog engaged on White only until he complied with orders and then disengaged.

After the fight ended and he was restrained, White was taken to the medical department. He suffered a wound in the bend of his left arm, which was cleaned and to which Dermabond was applied. The upper left of his torso had a skin tear, and that was cleaned and bandaged.

After follow-up appointments two weeks later, which followed a complaint by him that his left arm was "numb," White did not seek or obtain further medical treatment related to his injuries.

## II. DISCUSSION

### A. Motion to Dismiss by Kiser and Clarke

#### 1. Motion to Dismiss Standard

A district court should dismiss a complaint under Rule 12(b)(6) if, accepting all well-pleaded allegations in the complaint as true and drawing all reasonable factual inferences in the plaintiff's favor, the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Moreover, a court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

#### 2. White Fails to State a Claim Against Clarke or Kiser

In order to state an Eighth Amendment claim against defendant Clarke or Kiser based on a theory of supervisory liability, White must allege facts sufficient to show that (1) the supervisor "had actual or constructive knowledge that [a] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) the supervisor's "response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'"; and (3) there was an "affirmative causal link" between the defendant's conduct and plaintiff's "particular constitutional injury." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw*

11

*v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

In light of the court's grant of summary judgment to McReynolds, however, the court has concluded that the undisputed evidence shows there was no constitutional violation in this case. Thus, White is unable to establish the third prong of a supervisory liability claim. As both the Supreme Court and the Fourth Circuit have repeatedly recognized, there can be no supervisory liability under § 1983 when there is no underlying violation of the Constitution. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001); *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 724 (4th Cir. 1991); *Belcher v. Oliver*, 898 F.2d 32, 36 (4th Cir. 1990). For this reason, the supervisory claims against Clarke and Kiser are subject to dismissal and will be dismissed.

**B. Motion for Summary Judgment by McReynolds**

    **1. Summary Judgment Standard**

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

### 2. McReynolds Is Entitled To Summary Judgment

The Eighth Amendment prohibits prison officials from inflicting unnecessary and wanton pain and suffering on prisoners. *Whitley v. Albers*, 475 U.S. 312, 320 (1986). To succeed on an excessive force claim, a plaintiff must show that the prison official (1) used "nontrivial" force (objective component), *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010), and (2) acted with "wantonness in the infliction of pain" (subjective component). *Whitley*, 475 U.S. at 322. In the prison context, analysis of the subjective component "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). Whether the force was necessary or intentionally aimed at inflicting unnecessary physical harm depends on factors such as the need for the application of force, the relationship between the need and the amount of force used, the extent of injury inflicted, the extent of the threat to the safety of staff and inmates reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. *Whitley*, 475 U.S. at 321; *see Wilkins*, 559 U.S. at 34.

Viewing the facts in the light most favorable to White, the court concludes that the *Whitley* factors favor McReynolds. First of all, there was clearly a need for the application of force, as VDOC officials have an obligation to take reasonable steps to protect inmates from violence at the hands of other inmates, *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994), and other efforts to stop this particular fight had failed. There was a fairly significant threat to the safety of staff and inmates, as well. An entire pod of inmates was out of their cells, and a fight

13

between inmates can spread (as it initially had here). Thus, there was a threat to the inmates involved in the fight, a threat to staff if they tried to intervene directly, and the potential for other inmates, none of whom were restrained, to re-engage or use the distraction to harm other inmates or staff.

The facts also reflect that there were efforts made to temper the severity of the response, including multiple verbal warnings from Adams and the filing of multiple impact rounds, at least one of which hit one of the fighting inmates. While it is true that OC spray could have been used before engaging a K-9, as White suggests, White has not cited to any authority stating that the Constitution requires escalating through all levels of possible force in a given situation, nor is the court aware of any. Furthermore, while it would have been preferable to give a warning about the dog specifically before engaging it,[6] White likewise has not cited to any authority in the prison context suggesting such warnings are required.[7] Furthermore, the response also was tempered in that the dog engaged on White only until he complied and stopped fighting. Then, it was engaged on Wright, but only until he stopped attacking White. This, too, supports that the purpose of the engaging the dog was in an effort to restore order, not "maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6.

The relationship between the need and the amount of force used also supports McReynolds. The fight had continued for thirty seconds before Boris engaged on White.

---

[6] Under White's description of the event, he was unconscious before the dog engaged, so it is unclear to the court what difference any verbal warning would have made to him.

[7] Outside the prison context, courts have held that the Fourth Amendment requires a verbal warning before engaging the canine where there is no immediate threat to the officer or public. *E.g.*, *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 179 (4th Cir. 1998) ("[I]t was clearly established in 1995 that failing to give a verbal warning before deploying a police dog to seize someone is objectively unreasonable and a violation of the Fourth Amendment."); *Rodgers v. Smith*, 188 F. App'x 175, 193 (4th Cir. 2006) (noting that the Fourth Amendment is not violated by a lack of a warning if the officer faces an immediate threat). *Cf. Hughes v. Rodriguez*, 31 F.4th 1211, 1221 (9th Cir. 2022) (addressing claim that officers used excessive force in releasing police dog on escaped inmate and discussing the different tests for a Fourth Amendment violation and an Eighth Amendment violation).

Particularly after repeated direct orders to stop fighting, the fighting inmates, including White, knew they were being directed to stop. Notably, lethal force was not used, and the force discontinued immediately once White complied with orders to stop fighting. Thus, the force was proportionate to the need to stop the threat.

The nature of White's injuries also favors McReynolds, although only slightly. The court recognizes that engaging a canine on a human being is—or at least can be—a significant use of force. And while engagement by a well-trained animal should not lead to significant injuries or death, both can result. *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 362 (4th Cir. 2010) (Michael, C.J., dissenting in part and concurring in part) (collecting authority and summarizing that "find-and-bite police dogs have caused serious injury, disfigurement, and even death."). The court does not doubt that White now has an extreme fear of dogs, as he claims. But White did not suffer significant physical injuries, as evidenced by the photos of those injuries and White's medical record. This conclusion also is supported by the fact that his injuries did not require him to go to the hospital, spend time overnight in the medical unit at ROSP, or obtain any significant follow-up treatment.

In short, McReynolds has testified that he engaged Boris "in a good faith effort to restore discipline in response to Inmate White's failure to obey orders." That assertion is supported by the *Whitley* factors, as applied to the undisputed facts. The court thus concludes that White has failed to produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *See Abcor Corp.*, 916 F.2d at 930. Instead, McReynolds's motion for summary judgment will be granted.

**C. White's Motions**

In light of the court's rulings, White's other motions will be denied as moot. The court

further notes, however, that even if the case continued, the court would deny White's motion for temporary restraining order. Preliminary injunctive relief is an "extraordinary" remedy that courts should grant only "sparingly." *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991). The party seeking the preliminary injunction must demonstrate that: (1) he is likely to succeed on the merits at trial; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 249 (4th Cir. 2014). The remedy may be granted only on a "clear showing" of entitlement to relief. *Winter*, 555 U.S. at 22.

Important here, a preliminary injunction is not appropriate when the harm complained of does not arise from the harm alleged in the complaint. *Omega World Travel v. TWA*, 111 F.3d 14, 16 (4th Cir. 1997). The movant thus must establish a relationship between the injury claimed in the motion and the conduct giving rise to the complaint. *Id.*; *see In re Microsoft Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003). "[A] preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action." *Omega World Travel*, 111 F.3d at 16; *see Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994).

Applying those standards, the court concludes that White's motion must be denied because it asks for relief that is unrelated to his underlying claims, in violation of the principles set forth in *Omega World Travel*. His motion alleges that staff at ROSP have assaulted him, lodged false disciplinary charges against him, and threatened to transfer him to another facility, all in retaliation for his filing of this lawsuit and other complaints. This case, however, concerns

16

a March 2020 incident in which White was injured after a K-9 Officer engaged his dog on him during a fight. If White believes that his constitutional rights have been or are being violated by the incidents he describes in his motion, he may file a separate lawsuit or lawsuits asserting those claims, after first exhausting his administrative remedies. But those claims are not before the court, and the harm claimed in his current motion is not "caused by the wrong claimed in the underlying action." *See Omega World Travel*, 111 F.3d at 16. Thus, the injunctive relief he seeks is not related to the claims in this lawsuit, and the court may not grant it. *See id.*

Further, White has since been transferred to a different facility, which moots his claim for injunctive relief against staff at ROSP. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (prisoner's transfer rendered moot his claims for injunctive and declaratory relief arising at the prior facility); *Magee v. Waters*, 810 F.2d 451, 452 (4th Cir. 1987) (holding that transfer of a prisoner rendered moot his claim for injunctive relief); *Taylor v. Rogers*, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986) (holding that transfer mooted claim for injunctive relief).

### III. CONCLUSION

For the reasons stated above, the court will grant defendants' motions to dismiss and for summary judgment. (Dkt. Nos. 13, 22.) The court will deny as moot plaintiff's motions to proceed *in forma pauperis* (Dkt. Nos. 34, 36), and it will deny as moot his motion for a temporary restraining order (Dkt. No. 32), but without prejudice to his ability to seek relief or assert claims based on the same allegations in any future case.

An appropriate order will be entered.

Entered: February 8, 2023.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge